## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TIMOTHY LEE GIBSON,

        Plaintiff,

vs.                                No. CIV 02-091 LH/LFG

IRMA LUCERO, et al.,

        Defendants.

### MAGISTRATE JUDGE'S ANALYSIS
### AND RECOMMENDED DISPOSITION[1]

### Introduction

This is a *pro se, informa pauperis* civil rights action brought under 42 U.S.C. § 1983 by

Plaintiff Timothy Lee Gibson ("Gibson"). Gibson is currently incarcerated at the Central New

Mexico Correctional Facility in Los Lunas, New Mexico. His First Amended Complaint[2] [Doc. 14],

filed May 6, 2002, alleges that while incarcerated at Western New Mexico Correctional Facility

("WNMCF"), the constant exposure to second-hand cigarette smoke and toxic fumes and the denial

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

[2] A Memorandum Opinion and Order, entered April 5, 2002, dismissed all of the claims and most Defendants in the original Complaint except for those claims against Defendant Lucero. On May 6, 2002, Gibson filed a First Amended Complaint adding five additional Defendants. All Defendants have answered the First Amended Complaint, and now request summary judgment on all claims asserted against them by Gibson.

of medical treatment violated his Eighth Amendment right to be free from cruel and unusual punishment.  He requests relief in the amount of $12,250,000 and to be moved "to a smoke and toxic free environment."  [Doc. 14.]

This matter comes before the Court on the Motion for Summary Judgment [Docs. 35 and 36], filed by Defendants Irma Lucero, John Shanks, Sue Romero, Roberta Lucero, Jeff Serna, and George Garcia ("Defendants"), filed August 29, 2002.  Defendants concede that Gibson exhausted his administrative remedies before filing this lawsuit but argue that they are entitled to judgment as a matter of law because Gibson did not establish, as he must, that Defendants acted with deliberate indifference as to Gibson's health or safety.

In deciding this matter, the Court considered all of the pleadings, including the following: Gibson's Amended Complaint; the Answers to the Amended Complaint, filed by Defendants [docs. 18, 26]; Gibson's Reply to Lucero's Answer [doc. 29]; Gibson's Reply to remaining Defendants' Answer [docs. 31, 41]; Plaintiff's Answer to Defendants' Motion for Summary Judgment [doc. 44]; Defendants' Reply [doc. 46]; Gibson's [sur]Reply to Defendants' reply [doc. 48]; and Gibson's requests for appointment of counsel.  In addition, on February 7, 2003, the Court ordered Defendants to provide a Martinez Report, which Defendants filed on March 14, 2003 [doc. 54] and which the Court also considered.  Gibson was informed by the Order directing submission of a Martinez Report that he had thirty days after service of the Report to submit a response.  [Doc. 51.]  As of April 22, 2003, no response was filed.

## Summary Judgment Standard

A summary judgment proceeding is appropriately used to cut through the allegations of the pleadings and to determine if there is a triable issue.  Summary judgment will be granted when the

moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The court does not weigh evidence nor does it decide the issues of fact, but rather, only determines if there is an issue that must be resolved at trial.

Summary judgment is appropriate only if there is insufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party.  Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  Thus, the Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id., at 251-52, 106 S. Ct. at 2512.  The Court, in considering a motion for summary judgment, construes the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion.  Perry v. Woodward, 199 F.3d 1126, 1131 (10th Cir. 1999), cert. denied, 529 U.S. 1110, 120 S. Ct. 1964 (2000).

## Factual Background

The following facts do not appear to be disputed.  Gibson was previously incarcerated at WNMCF from about September 18, 2001 until April 2, 2002.  [Irma Lucero Affidavit at ¶ 2, attached to Defendants' Motion for Summary Judgment.]  On November 5, 2001, Gibson filed a grievance regarding exposure to second-hand smoke and fumes, explaining that he "received chemical inhalation at White Sands Missile Range" in 1985, after which 40% of his lungs were destroyed.  [Grievance, attached to First Amended Complaint.]  Gibson alleged that his health was steadily deteriorating at WNMCF because of the cigarette smoke he was forced to inhale, and further asserted that his allergies were a lot worse and he was starting to wheeze.  [Id.]  On November 8, 2001, the grievance

3

was considered and denied.  The grievance officer explained that there were not any no-smoking pods currently available at WNMCF and recommended that Gibson's classification be reviewed for alternative housing, "considering his current medical condition."  [Id.]  The grievance form directed Gibson to discuss the matter further with his caseworker.  Gibson appealed and explained that while "in committee" he was told that the only smoke-free place he could go to was Central Minimum Restrict Unit ("CMRU"), a minimum restriction facility in Los Lunas.  However, Gibson he did not qualify for a minimum restriction facility because he had about 4½ years remaining on his sentence, and to be eligible he needed less than 4 years left to serve.  [Id.]  On January 17, 2002, an agent, on behalf of John Shanks, signed a decision on Gibson's grievance appeal.  The decision provided:

> Based on the initial investigation it was determined that a classification committee must decide your placement.  You may request the medical department to review your file and recommend that you be transferred to an institution that has a non-smoking unit.  Therefore you need to discuss your situation with medical for a possible referral.

[Id.]  A week later, on January 24, 2002, Gibson filed his § 1983 federal civil rights complaint.  [Doc. 1.]  By April 2002, Gibson was eligible for the transfer to CMRU and was transferred in early April.  [Doc. 7, change of address.]  Thus, his request for injunctive relief is moot by the transfer.

At all pertinent times, Dr. Donna Deming, a physician working for Correctional Medical Services, was assigned to provide medical treatment to inmates housed at WNMCF.  [Donna Deming Aff. at ¶ 1, attached to Martinez Report.]  Dr. Deming was treating Gibson during late 2001.  [Deming Aff. at ¶ 2.]

While Gibson argues that some of the following testimony is contested, he provides no competent Rule 56 support for his position and instead, relies on mere allegations and denials.  Dr. Deming's medical opinion was that Gibson did not need an immediate or emergency transfer to a

smoke-free facility.  [Id. at ¶ 4.]  In cases where an inmates needs an immediate or emergency transfer due to medical reasons, Dr. Deming's practice is to arrange for the transfer directly through Warden Irma Lucero.  [Id. at ¶ 4.]  Dr. Deming did not request such a transfer for Gibson because she did not believe his medical condition warranted it.  [Id. at ¶ 5.]  She stated that he was not losing substantial amounts of weight which might indicate a deterioration of his respiratory condition.  Dr. Deming supplied further sworn testimony that Gibson's condition was not life threatening and did not require emergency treatment.  "I also know that I offered inmate Gibson placement in WNMCF administrative segregation, which is a smoke free area, and Mr. Gibson refused placement there."  [Id. at ¶ 5.]

Dr. Deming did, however, draft a memo, dated November 21, 2001, to Mary Lou Beckner (a WNMCF classification officer[3]), that contains the single line: "Timothy Gibson #39027 needs a smoke free housing unit for medical reasons."  [Ex. 1 to Defendants' Motion.]  Gibson asserts that the memo was a letter that was "received or read by all defendants stating 'Mr. Gibson needs to be moved immediately due to his medical condition.'"  [First Amended Complaint.]  However, the one-line memo says nothing about the need for an immediate transfer nor was the memo addressed to all Defendants.  In contrast to Gibson's unsubstantiated assertions, Dr. Deming explains that the memo does not state that Gibson needed any type of emergency care or transfer because he did not need such treatment.  Dr. Deming stated that if he had required such treatment, she would not have prepared a memo like Exhibit 1 to a caseworker or classification officer.  Instead, under

---

[3]A classification officer's authority is limited to helping inmates proceed through the normal or routine classification or reclassification process.  [Lucero Aff., at  ¶ 5.]

circumstances demanding an emergency transfer, Dr. Deming would have notified Warden Lucero directly.  [Deming Aff. at ¶ 6.]

Dr. Deming recalled speaking to Sue Romero, Director of Classification at WNMCF, and telling her to send Gibson to CMRU in Los Lunas whenever he became eligible for such a transfer. [Id. at  ¶ 7.]  Dr. Deming told Ms. Romero that Gibson's condition did not require an immediate transfer.  [Id.]  Dr. Deming hoped that the eventual transfer would assist Gibson but stated that it was difficult to predict since Gibson had a respiratory condition long before he arrived at WNMCF.  [Id. at ¶ 8.]

Warden Lucero provided affidavit testimony that while Ms. Romero informed her of Dr. Deming's memo (which was directed only to a classification officer), Warden Lucero was not told that Gibson had a serious medical condition that required an immediate transfer.  [Irma Lucero Affidavit, at ¶¶ 3, 4, attached to Defendants' Motion.]  Warden Lucero interpreted Dr. Deming's one-line memo to be a recommendation to place Gibson in a smoke-free housing unit through the use of routine classification processes or other non-emergency avenues.  [Id. at  ¶ 4.]  In addition, Warden Lucero believed that Gibson's situation did not require immediate action, based on her past experiences with CMS medical personnel, which included circumstances where CMS medical personnel made direct verbal recommendations to Lucero, supported by medical documentation, when immediate transfers of inmates were warranted.  Warden Lucero further testified that no CMS physician came to her about Gibson regarding his alleged emergency condition and no medical documentation was provided to Lucero supporting a request for an immediate transfer.  [Id. at ¶ 5.]

Warden Lucero also stated that once she did learn of Dr. Deming's memo, Lucero directed Sue Romero to get Gibson in front of the WNMCF classification committee, via normal or routine

6

classification procedure, so that the committee could consider Gibson's transfer to a smoke-free environment.  [Id. at 7.]  Warden Lucero advised Sue Romero to check into placing Gibson in the Geriatric Unit, which is a smoke-free unit at CNMCF, but was informed that the Geriatric Unit would not accept him because he did not appear to suffer from the requisite substantial, serious or chronic-type illness.  [Id.]

The other reason that Gibson was not immediately transferred to a smoke-free facility and why it took until April 2, 2002 before he was transferred to CMRU was that he did not originally meet all classification criteria for placement into a minimum restrict (level II) facility such as CMRU. Initially, he was a medium custody (level III) inmate.  Once he met the criteria, he was transferred to the level II facility.  [Id. at ¶ 9.]

Warden Lucero attested that she was not aware of Gibson's concerns as she did not review his grievance proceedings, and he did not complain directly to her.  Even if she had learned of his complaints, she would have required medical documentation before authorizing an immediate transfer.  [Id. at 11.]

Gibson's complaint is also brought against George Garcia, who was a grievance officer at WNMCF.  Garcia explained in his affidavit that he did not deny Gibson's grievance, but rather recommended that Gibson's classification be reviewed to see if he was eligible for alternative housing. [George Garcia Aff. at ¶ 3.]  While Garcia spoke to Dr. Deming about Gibson, the doctor did not tell Garcia that Gibson's condition was urgent or that it required immediate action.  Gibson told Garcia that he needed an immediate transfer, but Garcia could not rely solely on Gibson's word and instead needed the treating physician's recommendation.  Here, Dr. Deming did not inform Garcia of a serious medical condition.  [Id. at ¶¶ 4, 5.]

7

Gibson also names Sue Romero as a defendant and alleges that she refused on two occasions to "override him" to another facility despite her knowledge of his medical problem. [Sue Romero Aff. at ¶ 3.] Ms. Romero recommended to the Central Office Classification Bureau "on one or more occasions" that it consider transferring Gibson to a smoke free facility due to WNMCF's lack of smoke-free units. She testified that the Classification Bureau disapproved her recommendations and that she had no authority to override its disapproval. [Id. at 3.] Once Gibson became eligible for placement in a level II facility, he was again recommended for transfer. At that point, the recommendation was successful. [Id.]

Ms. Romero saw the memo written by Dr. Deming but states that she did not understand the memo to mean that Gibson needed an immediate transfer. [Id. at 4.] Romero recalled a telephone conversation with Dr. Deming in December 2001, during which they discussed Gibson's condition. However, again, Ms. Romero did not recall Dr. Deming telling her that Gibson had a serious medical condition requiring immediate action. Ms. Romero further testified that at the November 2001 classification committee meeting, Gibson himself did not tell her he had a serious medical condition, that he was in constant pain, or that his health was at risk. [Id. at ¶ 6.] At the November meeting, the classification committee decided to place Gibson into an inmate porter position in the recreation yard of his unit, which allowed him to be out of his cell and unit for several hours a day and reduced his exposure to second-hand smoke in his unit. [Id.]

Gibson sued Roberta Lucero as well. She was a Unit Manager at WNMCF. Gibson alleged that Lucero also refused to "override him" to another facility despite knowledge of his medical problem. Lucero provided affidavit testimony that she refused to send him to another facility after the Central Office Classification Bureau denied the WNMCF Classification Committee's recommen-

8

dation that he be transferred because she lacked the authority to override the decision. [Roberta Lucero Aff. at ¶ 3.] However, once he became eligible for the transfer, he was moved to CMRU. Lucero further stated that she did not know Gibson was in constant pain or that he had a serious medical condition that required an immediate transfer. [Id. at ¶ 4.] She never saw Dr. Deming's memo until after this lawsuit was filed. [Id.]

Lucero recalled a telephone conversation she had with Dr. Deming in December 2001. While Dr. Deming recommended a smoke-free facility for Gibson, she did not tell Lucero that Gibson had a serious or life threatening medical condition. Lucero knew from experience that if Dr. Deming needed to transfer someone immediately, she did not need Lucero's approval or the classification committee's authorization. [Id. at ¶ 5.] Lucero further stated that Dr. Deming told her that she did not want to move Gibson to the Long Term Care Unit in Los Lunas, which is smoke-free, because his condition was not sufficiently serious to warrant it.

Lucero testified that in February 2002, the WNMCF classification committee deferred taking action on Gibson's request for a transfer pending further review of his request by medical staff. [Id. at ¶ 6.] Lucero called Dr. Deming again and Dr. Deming told her that Gibson's situation was not an emergency and did not require an emergency transfer. [Id.]

Even though Lucero did not consider Gibson to have a serious or life threatening condition, she tried to work with him about his complaints. In February or March 2002, she had him assigned to a "meditation" unit, which had no smoking in the common areas and where each inmate was housed alone in a single cell. [Id. at ¶ 7.] She also helped him get a job in the kitchen at the same time that kept him out of the housing pods during a good portion of the day when he was working.

9

According to Lucero, Gibson told her that once he was assigned to the meditation unit and to kitchen duty, the situation regarding second-hand smoke was pretty good.  [Id.]

Gibson also sued Jeff Serna, a Deputy Classification Bureau Chief located at the New Mexico Correction Department's central office in Santa Fe.  Gibson alleged that Serna refused to transfer him to another facility even though Serna knew of his medical condition.  Serna explained that generally when a facility's classification committee makes a recommendation, the recommendation comes to the central office for review and approval or disapproval.  [Jeff Serna Aff. at ¶ 3.]  In March 2002, Serna received a recommendation from the committee that Gibson be transferred to a smoke-free facility due to medical issues.  [Id.]  Serna denied the recommendation because he understood there were no smoke-free units at a level II or level III facility.  Further, Gibson did not qualify for a level II facility as of that date.  [Id. at ¶ 3.]

In April 2002, Gibson did qualify for a level II facility, and the classification again recommended to Serna that Gibson be transferred.  Serna then approved the transfer to CMRU. Serna provided further sworn testimony that he did not know Gibson had a serious medical condition or that he required an immediate transfer.  [Id. at ¶ 5.]  He also stated that if Dr. Deming had recommended an immediate transfer, she would not have needed Serna's input to complete the transfer.  When Gibson's requests came through the routine classification process, Serna saw no reason to treat it as an emergency request.  [Id. at 6.]

Finally, Gibson also sued John Shanks, the Deputy Secretary of Operations for the New Mexico Corrections Department.  Gibson alleged that Shanks denied his appeal of the grievance even though Shanks supposedly knew Gibson was in constant pain from cigarette smoke and toxic fume exposure.  [John Shanks Aff. at ¶ 3.]  Shanks provided affidavit testimony that he did not deny

10

Gibson's grievance appeal.  Instead, it was an agent of Shanks who signed the denial of the appeal on Shanks' behalf.  Shanks never saw the grievance before the First Amended Complaint was served on him.  [Id. at ¶ 4.]  Similarly, Shanks was not informed of any medical condition Gibson had until he received the First Amended Complaint.  [Id. at ¶ 5.]  Shanks provided additional testimony, similar to the other Defendants, that if a physician believed an immediate transfer was necessary due to a medical condition, the physician need not await the grievance or classification committee process. [Id. at ¶ 6.]

## Analysis

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Helling v. McKinney, 509 U.S. 25, 31, 113 S.Ct. 2475 (1993).  However, accidental or inadvertent failure to provide adequate medical care does not violate a prisoner's Eight Amendment rights.  Rather, the prisoner bears the burden of establishing that prison officials acted with  "deliberate indifference to serious medical needs of prisoners."  Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 2326 (1991). Additionally, the "Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner, but only to that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind."  Snipes v. DeTella, 95 F.3d 586, 590 (7th Cir. 1996), *cert. denied,* 519 U.S. 1126 (1997).

In Helling, the United States Supreme Court applied Wilson to a situation involving an inmate's allegations that he was subjected to cruel and unusual punishment because of exposure to second-hand cigarette smoke.  To state a viable Eighth Amendment claim, the inmate must make a two-part showing, involving an objective and subjective component.  First, he must establish that he

11

was exposed to unreasonably high levels of environmental tobacco smoke ("ETS").  Helling, 509

U.S. at 35.  The Helling Court advised that the determination of this objective factor --

> requires more than a scientific and statistical inquiry into the
> seriousness of the potential harm and the likelihood that such injury to
> health will actually be caused by exposure to ETS.  It also requires a
> court to assess whether society considers the risk that the prisoner
> complains of to be so grave that it violates contemporary standards of
> decency to expose *anyone* unwillingly to such a risk.  In other words,
> the prisoner must show that the risk of which he complains is not one
> that today's society chooses to tolerate.

Id. at 34 (emphasis in original).

The second part of the inquiry requires that the inmate allege facts showing that prison

officials were deliberately indifferent to an excessive risk of harm, of which they were aware.  Farmer

v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970 (1994).  Deliberate indifference is shown only when

the defendant "knows of and disregards an excessive risk to inmate health and safety."  Id. at 837.

Put differently, deliberate indifference requires, "at a minimum, that the prison officials have realized

there was imminent danger and have refused – consciously refused, knowingly refused – to do

anything about it."  Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078 (1986).  If the officials did not

know about it, or cannot do anything about it, the subjective component is not established.  Wilson,

501 U.S. at 301.  Moreover, a showing of negligence or constructive notice will not satisfy the

deliberate indifference standard.  Farmer, 511 U.S. at 835, 841.

**A.     *Objective Showing of Exposure to Unreasonably High Levels of ETS*:**

Defendants elected not to address whether Gibson failed to demonstrate exposure to

unreasonably high levels of ETS, and instead contend that Gibson's complaint must be dismissed for

failure to show that  Defendants acted with "deliberate indifference."  Thus, the Court does not

decide the first prong of the test that Gibson bears the burden of demonstrating.  However, the Court notes in discussing Gibson's allegations *infra* that it appears Gibson has not provided competent evidence sufficient to demonstrate that his alleged exposure created "a risk . . . [that is] so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."  Helling, 509 U.S. at 36.  This seems particularly true since an inmate is not entitled to a smoke-free correctional facility, Barry v. Wilson, 91 F.3d 159 (Table, Text in Westlaw), 1996 WL 366217 at *2 (10th Cir. July 2, 1996), and because the Constitution does not mandate comfortable prisons.  Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392 (1981).

Here, for example, Gibson provides few specific allegations with respect to his Eighth Amendment claim, and no affidavit or other admissible testimony setting out specific facts that might raise a genuine issue of fact.  In his First Amended Complaint, he alleges that he lost 40% of his lungs about 15 years ago.  He states that he has been forced into a situation where he "constantly breathes secondary cigarette smoke and toxic fumes," that his life is in danger, and that he has been subjected to "unusual pain and suffering."  His complaint may be read to assert claims both of alleged present and future injuries due to exposure to ETS.

Gibson also alleges that he was forced to live in a pod (for apparently less than 8 months before his transfer) that "has little or no ventilation and no filteration of the air system, where 15 inmates in here smoke constantly."  [First Amended Complaint, Claim II.]  He further asserts that his "lungs and body as a whole have diminished dramatically.  I am on breathing treatments and steroids, which are doing damage to my body themselves."  [Id.]  In another pleading, Gibson asserts that he has endured both physical and mental pain with respect to the exposure to ETS.  "I still have

nightmares about the spitting up of blood and not being able to catch my breath thinking I was dying." [Doc. 29.]

Noticeably missing is competent evidence (or even mere allegations) as to the following: whether Gibson was housed with a smoking inmate and how many packs per day the cellmate smoked; whether exposure to ETS occurred in common areas as well as Gibson's cell; whether there was a non-smoking policy that was violated or not enforced; whether Gibson required any type of emergency type medical treatment; how many visits or sick calls he made to a health care providers regarding his complaints; what specific complaints he made to medical care providers about ETS and related medical symptoms; what specific prescribed "treatments and steroids" he was taking and for how long; whether any of his medications were increased due to exposure to ETS; medical testing, results and diagnoses related to ETS exposure; the size of his cell and/or pod and any ventilation that did exist; the length of time during each day when Gibson was forced to endure second-hand smoke versus; the length of time he was placed in situations where he was not exposed to ETS; whether he suffered from physical complaints or illnesses related to ETS, including eye irritations, severe headaches, chest pains, emphysema, asthma, dizziness, blackouts, vomiting, congestion, shortness of breath, and/or other respiratory problems; and what specific verbal or written complaints Gibson raised to prison officials, other than the single grievance that was attached to pleadings.

Other than dreams about spitting up blood and shortness of breath, Gibson's meager allegations, as stated, do not appear to add up to even mild physical complaints related to exposure to ETS. Moreover, his stay at WNMCF was relatively brief in time, and according to Defendants' affidavits, he was placed in smoke-free situations through some parts of the days which seemed to alleviate his complaints, even though he neither supplied this information nor evidence contradicting

14

it. While Gibson may have had a long-standing lung condition before he was incarcerated at WNMCF, he provides no information what that condition was like before coming to WNMCF or how the 8 month period at WNMCF affected his condition.

Gibson claims that he could have better supported his complaint if he were allowed discovery. He argues that with discovery he would have provided information regarding corrections department employees who have similar problems to his and who are suing, and other supporting information. Because he has been transferred from WNMCF, he states that he no longer has access to fellow prisoners and cannot obtain their affidavits without discovery. However, Plaintiff himself is in the best position to provide detailed affidavit testimony about the particulars of his medical condition and what he experienced at WNMCF, including visits he made to health care providers, medications he was prescribed at WNMCF, and the exact environmental conditions he endured. Yet he provides none of these details. Thus, it seems unlikely he could establish that the challenged conditions of confinement were objectively so serious as to amount to the denial of a basic human need, or that his particular medical conditions warranted a smoke-free environment.

**B.     _Deliberate Indifference by Defendant Prison Officials_:**

The evidence presented by Defendants, that is uncontested by Gibson, demonstrates that Defendants did not act with "deliberate indifference" towards Gibson's condition. "Prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844; *see also* Barney v. Pulsipher, 143 F.3d 1299, 1311 n. 12 (10th Cir. 1998).

Here, it is not certain at all whether each one of these Defendants knew of a substantial or excessive risk to inmate health or to Gibson's health, or if any harm to Gibson actually resulted from

exposure to ETS.  Gibson's grievance did not necessarily alert each Defendant[4] of an excessive risk

to his health  – first, because, not every Defendant was aware of his grievance, and secondly because

Gibson's description of his complaints in the grievance does not communicate a serious medical

condition or excessive risk.  His complaints are general in nature, alleging increased problems with

allergies and wheezing.  In addition, Dr. Deming's one line memo was also not received or reviewed

by each Defendant, and similarly fails to convey the message that Gibson suffered from a serious

medical condition requiring immediate attention.

Even if Gibson could show that Defendants were aware of the facts from which the inference

could be drawn that a substantial risk of serious harm existed and that Defendants did draw such an

inference, it is clear that Defendants acted reasonably in responding to Gibson's complaints and

grievances.  Further, Defendants did not disregard the risk by failing to take reasonable measures to

abate any risk to Gibson.

Specifically, the uncontroverted evidence demonstrates that Gibson did not submit a grievance

until November 2001, and that Defendant promptly responded to it by recommending that Gibson's

classification be reviewed for alternative housing in view of his current medical condition.  Gibson

was directed to discuss this recommendation with his caseworker.  However, WNMCF did not have

an smoke-free pods available, and Gibson was not eligible as of that date for a transfer to level II

facility that did offer smoke-free pods.  When Gibson appealed this grievance result, his comments

indicated that he understood he could not be transferred to the smoke-free facility with over 4 years

---

[4]Although Defendants apparently do not urge dismissal based on lack of personal involvement, courts
generally are reluctant to find personal involvement of a prison official sufficient to support § 1983 liability where
allegations are limited to the receipt of an inmate's letters or complaints.  Zaire v. Artuz, 2003 WL 230868 at *6 n.
4 (S.D.N.Y. Feb. 3, 2003).

remaining on his sentence.  The appeal decision advised Gibson to request the medical department to review his file and recommend a transfer to a no-smoking facility and that a classification committee must decide his placement.

Each Defendant provided affidavit testimony that he or she had no understanding that Gibson's medical condition was sufficiently urgent or serious to require an immediate transfer.  In addition, the treating physician, Dr. Deming, testified that she had no reason to conclude that Gibson's medical condition required an immediate transfer, nor did she ever convey to Defendants that Gibson should be transferred immediately.  Indeed, Dr. Deming informed some Defendants that Gibson's condition did not require immediate attention.  Dr. Deming testified that her memo indicated only that he should be transferred in accordance with the normal non-emergency classification process.  Had Dr. Deming found that Gibson did require an immediate transfer, she could have and would have ensured that he was transferred.

Notwithstanding the non-emergency nature of Gibson's condition, Defendants attempted to work with Defendant to reduce his exposure to ETS.  Sue Romero testified that during Gibson's November 2001 classification committee meeting, a decision was made to place him into an inmate porter position in the recreation yard of his unit.  This placement allowed Gibson to be out of his cell for several hours a day which reduced his exposure to ETS in his unit.  Roberta Lucero provided affidavit testimony that she also tried to work with Gibson and in February or March 2002, had him assigned to a "meditation" unit which had no smoking in the common areas and where each inmate was housed alone in a single cell.  During the same period, Lucero was able to get Gibson a job in the kitchen which removed him from the housing pods for a good portion of the day when he was at

work.  According to Lucero, once Gibson had these assignments, he told her that his situation regarding second-hand smoke was pretty good.

Several months after these assignments, when Gibson was eligible for the transfer to a smoke-free facility, the transfer was made.  These types of responses by Defendants were reasonable under the circumstances where there were no smoke-free units available at WNMCF, where Gibson was not initially eligible for a transfer to CMRU, and where the treating physician did not consider his condition to warrant immediate action.   Moreover, Defendants' directions and attempts to transfer Gibson through classification procedures, assignments outside his unit to reduce exposure to ETS, Dr. Deming's offer to place him in the smoke-free administrative segregation, which he rejected, and the prompt transfer to a non-smoking facility once he became eligible cannot be construed as refusals to respond to Gibson's complaints.  Indeed, they are evidence of Defendants' good faith efforts to respond to Gibson's concerns.

Gibson has not provided any evidence or medical documentation to controvert the affidavit testimony supplied by Defendants.  Accordingly, that evidence must be deemed admitted for purposes of summary judgment.  Based on the uncontroverted evidence and Gibson's failure to bring forward any evidence to show deliberate indifference, there is no genuine issue of fact raised as to the Eighth Amendment claim, and it must fail as a matter of law.

**<u>Recommended Disposition</u>**

That Defendants' Motion for Summary Judgment [doc. 35] be GRANTED and that this matter be dismissed with prejudice.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge